**In re McNAR, INC. Debtor.**

**Bankruptcy No. 88–09051–H11.**

United States Bankruptcy Court, S.D. California.

Oct. 4, 1990.

Donald Merkin, Merkin & Hemme, La Jolla, Cal., for Kipperman, Trustee and Narain.

Duckor & Spradling, San Diego, Cal., for Greenberg.

## MEMORANDUM DECISION

JOHN J. HARGROVE, Bankruptcy Judge.

Presently pending is the third application for interim allowance of fees and reimbursement of expenses filed by Chapter 11 trustee Richard M. Kipperman ("trustee"). At issue is (1) the propriety and reasonableness of the fees charged by the trustee; and (2) whether the trustee's requested compensation may be based on disbursements to suppliers made by the trustee during administration of this case.

Creditors/equity security holders Kanwar and Ragini Narain ("Narain") objected on the grounds of reasonableness.

This court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334 and § 157 and General Order No. 312–D of the United States District Court, Southern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O).

## FACTS

On November 22, 1988, an involuntary petition seeking an order for relief under Chapter 11 of the Bankruptcy Code was filed against McNar, Inc. ("McNar"). This court entered an Order for Relief in this matter, and ordered the appointment of a trustee. The United States Trustee appointed Richard Kipperman the Chapter 11 trustee by order entered January 6, 1989.

On February 13, 1990, trustee filed his Third Application for Interim Compensation requesting $42,663.63 for services rendered from October 1, 1989 through January 31, 1990, and for reimbursement of expenses in the amount of $327.80. The fee was based on total cash disbursements of $1,422,121 for the period. Trustee submitted time records in support of the application indicating that he spent 105.4 hours working on the case during the period covered by the application.

Narain agrees that the trustee should receive reasonable compensation, but contends the trustee's request amounts to an unreasonable hourly rate of approximately $405.00 per hour.

At the fee hearing on March 12, 1990, this court awarded Kipperman interim fees based upon an hourly rate of $250.00 an hour for 105.4 hours, and costs of $327.80. The matter was further set for an evidentiary hearing.

## DISCUSSION

1. *Reasonableness.*

■ The trustee bears the burden of proof in all fee matters, including reimbursement of costs and expenses. *In re A–1 Hydro Mechanics Corp.,* 106 B.R. 198 (Bankr.D.Haw.1989).

Authorization for compensation of a trustee is found in § 330(a) of the Bankruptcy Code ("Code"), which states in pertinent part:

[T]he court may award to a trustee …

(1) reasonable compensation for actual, necessary services rendered … based on the nature, the extent, and the value of such services, and on the time spent on such services, and the cost of comparable services…. 11 U.S.C. § 330(a).

These criteria for setting trustee fees have closely resembled the factors used for awarding attorney's fees. *In re Financial Corp. of America,* 114 B.R. 221, 223 (9th Cir. BAP 1990).

Once reasonable fees are determined according to the above criteria, a trustee's fees are cut down, if required, to the statutory maximum stated in § 326(a). *Id.* at 223.

■ Trustee's fees should be set according to the § 330 criteria, not merely according to the amount of the monies disbursed. *Id.* at 224.

■ In employing the fee setting criteria of § 330(a), the bankruptcy judge is accorded wide discretion. *Id.* at 224.

■ The trustee under Chapter 11 of the Code is compensated for the work performed in carrying on the business of the estate; in contrast the Chapter 7 trustee is compensated for tasks pursuant to liquidation. *Id.* at 225.

■ In this third application for interim allowance of fees, the trustee requests the sum of $42,663.63 which he asserts represents a fee based on total cash disbursements in the Chapter 11 case of $1,422,121 for that same period. The trustee spent 105.4 hours for the period, evidenced by fairly detailed time records which were attached to the application. The trustee's average hourly rate, therefore based on a number of hours he spent in the four month period divided by the fees requested amounts to approximately $405.00 per hour.

By way of background, the case was initially commenced by one of two shareholders who were pitted against each other in a heated dispute over control of the debtor corporation. Aware of this background the trustee accepted his appointment on January 6, 1989. During the course of the Chapter 11 proceeding, both shareholders submitted competing Chapter 11 plans. This court ultimately confirmed the plan submitted by shareholder Narain which provided for a purchase of all of the stock of the debtor corporation and the payment, in cash, in full, of all allowed claims of the estate. The estate's primary assets consisted of a leasehold interest in Temecula, California, on which premises the debtor operated a self-service gasoline service station and a leasehold interest on real property located in San Diego, California. The trustee supervised the operation of the Temecula gas station from the inception of his appointment until January 29, 1990, when he turned the operation over to Narain pursuant to the plan of reorganization. During the time period involved, the trustee contends that he diligently performed his duties as provided for by § 1106 of the Bankruptcy Code by performing the following tasks:

(a) Investigating the affairs of the debtor;

(b) Organizing and analyzing the books and records of the debtor;

(c) Negotiating and preparing plan of reorganization and disclosure statement;

(d) Managing the assets of the debtor including the operation of the Mobil retail gasoline and sundry station located at 2811 Front Street, Temecula, California;

(e) Analyzing accounting issues with accountants and third parties;

(f) Conducting numerous meetings with the principals of the debtor to acquire information concerning the business operation;

(g) Negotiating with potential buyers regarding the sale of the debtor's assets;

(h) Preparing for and attending numerous court hearings regarding the case; and

(i) Administering the Chapter 11 case.

Narain contends that simply put, the trustee operated a gas station for about one year. He points out that all of the litigation in the case was handled by the trustee's court authorized attorneys and that the accountancy work was handled by the trustee's court authorized accountants. At the hearing before this court, the trustee admitted that the job was not a "giant" job and admitted that the Temecula gas station was a self-service station with no mini-market and no service or repair garage. The trustee also admitted that his average hourly rate as a consultant is customarily $125.00 per hour. Narain contends that under the circumstances in this case an average hourly rate of $150.00 is reasonable for the trustee. This court concurs.

There is no question that the trustee is experienced and competent. He holds a masters degree in business administration from San Diego State University. He has served as a Chapter 11 trustee in several complex business reorganization cases for the past 4 years and he is a member of the panel of Chapter 7 trustees and has handled over 900 cases.

In support of his request, the trustee notes that he did not hire a professional manager for the business and instead used only existing hourly wage personnel and that he therefore saved the estate approximately $3,000 to $6,000 per month. The

trustee also notes that he did not hire a business broker to market the Temecula gas station and the Mira Mesa leasehold in order to save the estate a commission and that therefore he believes he saved the estate another $100,000.

While all these facts are true, the savings simply do not justify the trustee in receiving extra compensation. Under the circumstances, the trustee's use of hourly-rate employees to operate the gas station was adequate. The trustee is a fiduciary and is charged with expeditiously and efficiently administering the Chapter 11 case.

Further, a careful review of the trustee's time sheets indicate that in October 1989, the trustee spent 15 days working on the case at an average of 1.83 hours per day for a total of 27.5 hours for the month. In November 1989, the trustee spent 17 days working on the case and averaged 1.95 hours per day for a total of 33.1 hours for the month. In December the trustee worked 16 days on the case averaging 1.75 hours per day for a total of 28 hours and in January 1990, the trustee worked on the case 20 days at an average of .81 hours per day for a total of 16.2 hours. For the entire four month period, the trustee averaged 17 days per month on the case at 1.59 hours per day for a total average of 26.2 hours a month. In short, the case was not overly demanding.

The trustee indicates that he was actively involved in setting gas pricing. His time sheets reflect several telephone calls with the manager of the Temecula station regarding "sales and pricing." In October he had two phone calls each totalling 3 tenths (.3) of an hour regarding sales and pricing. In November the trustee had three phone calls with the station manager regarding sales and pricing all of which totalled 9 tenths (.9) of an hour. In December, the trustee had two phone calls with the station manager regarding pricing totalling 5 tenths (.5) of an hour, and in January the trustee had three phone calls with the station manager totalling 7 tenths (.7) of an hour.

The record reflects that the Temecula gas station was a self-service station, and the trustee's time sheets for the period involved support Narain's contention that very little supervision was required by the trustee as far as the management of the station.

This court concludes that the pricing of gasoline was not complicated. Narain's declaration testimony indicates that when he began to run the gas station he simply surveyed the competition in the area and priced the Temecula station one or two cents below it. In fact, Narain notes that when he took over in late January 1990, the gross sales at the station increased from the $240,000 a month gross sales in November and December by the trustee to some $260,000 to $265,000 a month by Narain.

As far as the trustee's argument for maximum compensation because he saved the estate a broker commission on the sale of the Temecula station, the court finds that from the commencement of the case until the plan confirmation, it was clear that this was a two party dispute for control of the corporate assets. Co-owner Michael McNamara ("McNamara") proposed a plan to pay creditors in full by a loan and a refinance of the debtor's business. Narain proposed to simply cash out all of the claims of the estate in full with cash. Under these circumstances, the use of a broker was unnecessary.

The bulk of the trustee's services rendered during the four month period consisted primarily of ministerial functions such as preparing and completing operating reports, preparing and reviewing his own fee application, reviewing the fee application of his accountant and his attorneys, reviewing and preparing for the hearing on Narain's disclosure statement and attending the hearing on the disclosure statement, reviewing invoices and signing checks, meeting and conferring with the estate's bookkeeper, reviewing correspondence, investigating claims of the estate, reviewing and signing unspecified documents, and preparing to turn over the station to Narain after the sale of the Temecula station to Narain. This court concludes that the estate involved relatively few assets and little work and that the trustee's involvement was

rather routine. There was little impact on the trustee's time so as to force the trustee to forego other business opportunities or to disrupt his normal workload and business.

The evidence shows that the trustee primarily rendered ministerial services in a non-complicated case. Further, the operation of the gas station did not require any particular specialized knowledge by the trustee.

This case is very similar to the situation in *Matter of Frigorifico Y Almacen San Miguel*, 103 B.R. 18 (Bankr.D.P.R.1989); and *In re Garland Corp.*, 8 B.R. 826 (Bankr.D.Mass.1981). In *Garland*, the bankruptcy court in denying the trustee's request for compensation based on the sales of a knitting mill which he operated, noted that fees based on the maximum trustee's compensation under § 326 of the Code have really no correlation with the fair value for the services. The court went on to state that, "if, for example, the Trustee represented a supermarket or a discount store, there would be a large turnover of cash sales but that would in no way have any correlation with the value of the trustee's services." *Garland*, 8 B.R. at 833. In *Frigorifico*, the court disallowed trustee's fees based on § 326 based on monthly gross sales of a supermarket which the trustee operated.

The same rationale exists in this case for denying the trustee's request for maximum compensation under § 326.

In this case, a very substantial portion of the monthly disbursements by the trustee went to pay Mobil Oil for the gasoline that was purchased and pumped through the Temecula station. For example, the trustee's operating report indicates total disbursements in October 1989, of $194,146.15. $146,398.23 of that total represented payment to Mobil Oil.

The trustee also argues that he took the case with great personal risk to himself, since at the time he operated the gas station there was no environmental hazard insurance available for the operation of a retail gasoline station and that therefore if a gasoline leak or spilled occurred he could have been held personally liable for the clean up. The argument is not convincing. If the problem was that troubling, the trustee could have applied to this court for an order for authority to operate the station without insurance, arguing that immediate liquidation would cause material loss for all creditors or he could have asked this court to allow him to resign. Furthermore, the risk would not have been the trustee's but rather the estate's. Finally, the court notes that the matter was never brought to the court's attention as a matter of concern to the trustee.

The trustee bases his request for compensation on total cash disbursements of $1,422,121.00 for the four month period. However, no proof was offered by the trustee regarding these disbursements. The court's review of the operating reports submitted by the trustee for the same period shows total disbursements of $796,746.10 for the time period in question. This court will permit the trustee to submit additional proof at the next interim fee hearing or at his final request for fees in this case but the record at this time, does not support the trustee's contention of cash disbursements of $1,422,121 for the period October 1989 through January 1990.

2. *Whether Disbursements to Chapter 11 Post–Petition Trade Creditors and Suppliers Should be Used in the Calculation of Total Trustee Disbursements.*

This court *sua sponte* raised the issue as to whether the trustee's disbursements to creditors should include payments made to Chapter 11 debtor trade creditors and suppliers made during the course of the Chapter 11 proceeding for purposes of determining the trustee's fees. There is a split of authority as to whether the trustee's compensation is computed based on monies disbursed in a Chapter 11 to parties in interest. *In re Hays Builders, Inc.*, 95 B.R. 79 (Bankr.W.D.Tenn.1988).

Narain concedes the issue. Further, this circuit has held that the sale of encumbered assets includes a "constructive disbursement" to lien creditors, despite the fact that a portion of the asset's value

**154**

never becomes a part of the bankruptcy estate for the trustee to distribute. *Southwestern Media, Inc. v. Rau,* 708 F.2d 419 (9th Cir.1983). Finally, in view of the Bankruptcy Appellate Panel's recent decision in *In re Financial Corp. of America, supra,* holding that in making an interim award to a Chapter 11 trustee, the funds turned over to the Chapter 7 trustee should be counted in determining the § 326(a) statutory maximum, this court concludes that disbursements during the operation of the Chapter 11 to trade creditors and suppliers such as the Mobil Oil Company in this case should be counted in determining the § 326(a) statutory maximum available to a trustee, subject of course to the reasonableness requirement of § 330.

### CONCLUSION

There is no question that the trustee has performed admirably in this proceeding. However, the trustee's services were not extraordinary nor were special skills required during the approximately one year the trustee operated the estate. The trustee testified that his hourly average hourly rate is $125.00 per hour and Narain who ultimately paid for the services indicates a willingness to allow the trustee to be compensated at $150.00 per hour. Accordingly, for the third interim application, this court will allow compensation at the rate of $150.00 per hour. Therefore, based upon 105.4 hours incurred for the period involved, the trustee is entitled to receive the sum of $15,810.00 for the services rendered from October 1989 through January 1990.

If the trustee has already received payment pursuant to this court's ruling in court on March 12, 1990, the court will not at this time require reimbursement to be made to Narain, but will instead make any adjustments at the next interim application or the final application.

This court will take up the propriety of all prior interim awards and the question of the trustee's final award at the final fee hearing.

This Memorandum Decision constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. Counsel for Narain is directed to file with this court an Order in conformance with this Memorandum Decision within ten (10) days from the date of entry hereof.